T.C. Memo. 2020-143

UNITED STATES TAX COURT

SHELLEY JOU WIENKE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

EVERGROW INVESTMENTS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 15708-17, 15709-17.[1]          Filed October 14, 2020.

Shelley Jou Wienke, pro se in docket No. 15708-17.

Shelley Jou Wienke (an officer), for petitioner in docket No. 15709-17.

Nicholas R. Rosado, for respondent.

_____

[1] On June 4, 2019, we consolidated these cases for trial, briefing, and opinion.

**[*2]**     MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  In these consolidated cases respondent determined the following deficiencies, additions to tax, and penalties in notices of deficiency issued to Ms. Wienke and Evergrow Investments, Inc. (Evergrow), on May 10, 2017:[2]

Docket No. 15708-17     (Ms. Wienke)

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662 |
|------|-----------|------------------------------|----------------|
| 2012 | $98,323 | $24,581 | $19,665 |
| 2013 | 5,610 | 1,403 | 1,122 |

Docket No. 15709-17     (Evergrow)

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662 |
|------|-----------|------------------------------|----------------|
| 2012 | $13,788 | $3,447 | $2,758 |
| 2013 | 17,603 | 7,711 | 3,521 |
| 2014 | 112,169 | 30,805 | 22,434 |
| 2015 | 1,096 | 2,091 | 219 |

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect at all relevant times.  Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

**[*3]** After respondent conceded that petitioners are not liable for accuracy-related penalties under section 6662, the issues for decision are whether: (1) Ms. Wienke properly allocated rental property income between her and her husband (collectively, Wienkes) under California community property law for 2012 and 2013; (2) Ms. Wienke must include in her gross income cancellation of indebtedness of $144,516 and $39,613 for 2012 and 2013, respectively; (3) Ms. Wienke received constructive dividends of $9,707 and $14,593 for 2012 and 2013, respectively;[3] (4) Ms. Wienke is entitled to depreciation deductions she claimed on her Schedules E, Supplemental Income and Loss, in amounts greater than those respondent allowed for 2012 and 2013; (5) respondent abused his discretion in changing Ms. Wienke's method of accounting and making a section 481(a) adjustment to include $243,405 in her 2012 gross income; (6) Evergrow failed to report income of $50,572 for 2014; (7) Evergrow is entitled to deduct its business expenses and offset its gross receipts with cost of goods sold (COGS) in amounts greater than those respondent allowed for the years in issue; and (8) petitioners are liable for additions to tax under section 6651(a)(1) for failure to file timely returns.

---

[3] Respondent contends that Ms. Wienke received qualified dividends. Sec. 1(h)(11) provides preferential tax rates for "qualified dividend income" if a taxpayer received the dividend from a domestic corporation.

**[*4]** FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated

facts are incorporated in our findings by this reference. Ms. Wienke was a

resident of California when she timely filed her petition. Evergrow's principal

place of business was in California when it timely filed its petition.

I. Background

    A. The Wienkes

The Wienkes married in 1994 and lived in California at all relevant times.[4]

From 1994 through 2008 the Wienkes jointly acquired 28 residential rental

properties in areas around Clear Lake, California.[5] They owned all 28 properties

---

[4] The Wienkes were married during the years in issue, but Ms. Wienke filed for a temporary restraining order in 2015 on the grounds of domestic violence. They have since separated and filed for divorce, but the divorce was still pending as of the trial.

[5] The Wienkes also both managed each of the rental properties and held themselves out as real estate professionals during 2012 and 2013. They did not keep track of the time they spent managing the properties or retain invoices or receipts for any of their management expenses. The record includes a handwritten document that Ms. Wienke created some time before trial which lists repairs and projects related to managing some of the rental properties (e.g., cleaning, showing a property to potential renters). The document includes several notations for "total costs", but nothing in the document connects the costs to any particular date or item on the list. Much of the trial focused on Ms. Wienke's "real estate professional" arguments, but respondent did not adjust any of the deductions related to the rental properties other than depreciation.

**[\*5]** during 2012 and 2013.  The record includes several invoices from Piedmont Lumber showing that Mr. Wienke purchased materials for property renovations during the years in issue,[6] but the invoices do not indicate any particular property or renovation.

In 2007 Ms. Wienke refinanced the mortgage for one of the rental properties in Kelseyville, California (Kelseyville property).  In 2013 the lender, Seterus, Inc. (Seterus), foreclosed on the mortgage and discharged the Kelseyville property's outstanding debt.  Seterus issued a Form 1099-C, Cancellation of Debt, to Ms. Wienke in 2013 for $79,226.  Seterus checked the box on the form indicating that she was personally liable for repayment of the debt.

The Wienkes jointly owned two other nonrental properties, one in Clearlake, California (Clearlake property), and the other in Upper Lake, California (Upper Lake property), which they acquired in 2004.  In 2007 Mr. Wienke refinanced the mortgage for the Clearlake property with the Federal National Mortgage Association (Fannie Mae) and the mortgage for the Upper Lake property with the Federal Home Loan Mortgage Corporation (Freddie Mac).  In 2012 Fannie Mae and Freddie Mac foreclosed on their respective mortgages and discharged each property's outstanding debt, issuing Forms 1099-C for 2012

---

[6] Ms. Wienke did not provide these documents to respondent until trial.

[*6] reflecting discharged amounts of $155,477 and $133,554, respectively. The box indicating Mr. Wienke was personally liable for repayment of the debt was checked on each Form 1099-C as well.

### B. Evergrow

The Wienkes also owned Evergrow, a California corporation organized in 2007. Evergrow operated a grocery market and pizza store in San Francisco, California. Mr. and Ms. Wienke each owned a 50% interest in Evergrow during 2012 and 2013, and Ms. Wienke served as its president during the years in issue.

Evergrow's books for the years in issue reflected purchases of $908,363, $1,081,714, $1,042,515, and $1,049,669, respectively. The Wienkes "consumed" approximately $75 to $100 of those purchases per week for their personal use. Evergrow's books for 2013 and 2014 also reflected irregular payments to the Wienkes in the forms of draws and payments of their personal expenses that totaled $25,346 and $26,638, respectively. Evergrow did not file employment tax returns or issue Forms W-2, Wage and Tax Statement, with respect to any of those payments.

**[*7]** II. Petitioners' Tax Returns

A. Ms. Wienke

Ms. Wienke filed tax returns separately from her husband for each year in issue, electing the "married filing separately" option. She untimely filed Forms 1040, U.S. Individual Income Tax Return, for 2012 and 2013 on March 24, 2014, and February 2, 2015, respectively.

Ms. Wienke reported 18 rental properties on her 2012 return and 17 rental properties on her 2013 return; Mr. Wienke reported the remaining properties on his returns.[7] The Wienkes reported total rents received of $336,312 and $251,495 for 2012 and 2013, respectively. They also claimed rental expense deductions of $322,934 and $335,893 for 2012 and 2013, respectively, with $76,836 and $67,445 of those expense deductions on Ms. Wienke's returns claimed as depreciation deductions. Ms. Wienke did not report any wage income on either return.

---

[7] The record is silent as to how the Wienkes divided rental income and deductions for each rental property before the years in issue.

**[\*8]** B. Evergrow

For the years in issue Evergrow filed Forms 1120, U.S. Corporation Income Tax Return, on a fiscal year basis (ending March 31). Ms. Wienke was responsible for Evergrow's tax reporting and signed its tax returns.

1. 2012

Evergrow untimely filed its Form 1120 for 2012 on May 2, 2013. It reported $1,303,065 of gross receipts and $934,928 of COGS for a gross profit of $368,137. It offset this profit in part with business expense deductions of $33,889 for taxes and licenses and $23,750 for interest and other business expense deductions.

2. 2013

Evergrow untimely filed its Form 1120 for 2013 on December 29, 2015. It reported $1,612,096 of gross receipts and $1,087,539 of COGS for a gross profit of $524,557. It offset this profit with deductions for officers' compensation totaling $25,346 and other business expense deductions.

3. 2014

Evergrow untimely filed its Form 1120 for 2014 on December 29, 2015. It reported $1,917,386 of gross receipts and $1,081,935 of COGS for a gross profit of $835,451. It offset this profit in part with deductions for officers' compensation

**[\*9]** totaling $242,638. Of this amount Evergrow did not pay $216,000. Ms. Wienke included a deduction for the entire amount when she prepared Evergrow's Form 1120 to reflect her view of Evergrow's 2014 earnings.

### 4. 2015

Evergrow untimely filed its Form 1120 for 2015 on January 21, 2016. It reported $1,492,710 of gross receipts and $1,055,598 of COGS for a gross profit of $437,112.

## III. Petitioners' Audit

### A. Ms. Wienke

Respondent determined that the Wienkes had incorrectly reported income from the rental properties on their returns. He calculated the Wienkes' total income and expenses for all 28 properties and reallocated half of the income and expenses to Ms. Wienke. He did not make any adjustments to the rental income reported or expense deductions claimed other than the depreciation deductions. He used county property tax records to calculate each rental property's cost basis starting when it was placed in service and then determined the proper depreciation deduction schedule for each property. Respondent reduced Ms. Wienke's collective depreciation deductions by $56,558 and $39,803 for 2012 and 2013, respectively, on the basis of these schedules.

**[\*10]** Respondent further determined that the Wienkes had together claimed $1,026,746 of depreciation deductions for the rental properties from 1994 to 2011 but were entitled to only $539,935. He made a section 481(a) adjustment to the Wienkes' total 2012 income to include the $486,811 of disallowed depreciation deductions for all 28 rental properties for those prior years and allocated half of that amount ($243,405) to Ms. Wienke.

Respondent also determined that Ms. Wienke failed to report income from several sources. First, she failed to report her share of cancellation of debt income, which totaled $144,516 and $39,612 for 2012 and 2013, respectively. Second, respondent characterized Evergrow's officers' compensation as constructive dividends and determined that Ms. Wienke failed to report as income her portion, which totaled $9,707 and $14,593 for 2012 and 2013, respectively.

### B. Evergrow

Respondent also audited Evergrow's Forms 1120 for the years in issue. Evergrow was unable to provide the examining agent with an income summary for the pizza store for September 2013. To determine that month's gross receipts, respondent averaged the pizza store's August and October 2013 gross receipts. Petitioners did not object to this method of reconstructing the missing receipts

[*11] during the audit. Respondent determined that Evergrow failed to report gross receipts of $50,572 from September 2013 as income.

Respondent adjusted Evergrow's COGS for the years in issue by $28,775, $23,726, $5,000, and $5,000, respectively, to reflect discrepancies between the COGS listed on Evergrow's Forms 1120 and its books and the Wienkes' consumption of a portion of Evergrow's purchases for their personal use. He also reduced Evergrow's 2012 business expense deductions by $27,345 and disallowed entirely Evergrow's officers' compensation deductions for 2013 and 2014.

## OPINION

### I. Burden of Proof

Ordinarily, the burden of proof in cases before the Court is on the taxpayer. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a)(1), "[i]f, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue." See Higbee v. Commissioner, 116 T.C. 438, 442 (2001). Petitioners have neither claimed nor shown that they have presented credible evidence sufficient to shift the burden of proof to respondent as to any relevant factual issue under section 7491(a).

**[*12]** In cases involving failure to report income, the U.S. Court of Appeals for the Ninth Circuit, to which any appeal in these cases would ordinarily lie, see sec. 7482(b)(1)(A) and (B), has held that the Commissioner must introduce some evidence linking the taxpayer with an alleged income-producing activity or demonstrate that the taxpayer actually received unreported income before the presumption of correctness attaches to the deficiency determination, Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985); Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982).  The requisite evidentiary foundation is minimal and need not include direct evidence.  See Weimerskirch v. Commissioner, 596 F.2d 358, 360-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). Once the Commissioner has established this foundation, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations were arbitrary or erroneous.  See Hardy v. Commissioner, 181 F.3d 1002, 1004-1005 (9th Cir. 1999), aff'g T.C. Memo. 1997-97.  As discussed below, respondent has established a sufficient evidentiary foundation to satisfy any threshold burden as it relates to his determinations of unreported income from petitioners' various activities.

**[\*13]** II.  Unreported Income

Section 61(a) provides that gross income means "all income from whatever source derived".  See Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955). Taxpayers are responsible for maintaining adequate books and records sufficient to establish their income.  See sec. 6001; DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).  As stated above, the Commissioner must base his determination that the taxpayer received unreported income on "some substantive evidence" for the presumption of correctness to attach.  Hardy v. Commissioner, 181 F.3d at 1004-1005 (holding that third-party information returns were enough to satisfy the Commissioner's threshold burden).

A.  Ms. Wienke

1.  Community Property Income

Generally, community property income is included in a taxpayer's gross income.  Sec. 61(a); see Bernal v. Commissioner, 120 T.C. 102, 105-106 (2003) (citing United States v. Mitchell, 403 U.S. 190, 196-197 (1971)).  Married individuals in a community property State like California who do not file a joint tax return generally must report half of the total community property income the spouses earned during the taxable year.  Sec. 1.66-1(a), Income Tax Regs.; see also United States v. Malcolm, 282 U.S. 792, 794 (1931).

**[\*14]** A State's community property laws determine the ownership of community property income, while Federal law determines the Federal taxation of that income. See Mitchell v. Commissioner, 131 T.C. 215, 218 (2008) (citing Mitchell, 403 U.S. 190). Under California community property law, each spouse owns a one-half interest in the community estate, including income earned by both spouses during their marriage. See Cal. Fam. Code. secs. 751, 2550 (West 2016). They may elect to treat community property income separately however. See, e.g., Cal. Fam. Code secs. 1500 (regarding premarital agreements), 850 (regarding transmutation of community property to separate property by agreement or transfer) (West 2016).

The parties do not dispute that the Wienkes jointly owned and earned income from the rental properties during the years in issue. Ms. Wienke submitted no evidence to establish that they elected to treat any of their community property, or income from their property, separately. The only documents she did provide consisted of her tax returns showing the division of rental properties between herself and Mr. Wienke. But these returns are merely statements of her claims and are not considered evidence of the claims themselves. See Wilkinson v. Commissioner, 71 T.C. 633 (1979); Ehrensperger v. Commissioner, T.C. Memo. 1994-279, 1994 WL 269153, at \*5 ("The entries on the returns of petitioner and

[*15] his spouse are not evidence to establish the truth of the matters set forth therein but merely a statement of their claim."). We therefore sustain respondent's allocation of one-half of the rental property income to Ms. Wienke as community property income.

## 2. Cancellation of Debt Income

Generally, a taxpayer must include income from the discharge of indebtedness. Sec. 61(a)(12); sec. 1.61-12(a), Income Tax Regs. The underlying rationale for the inclusion of discharged debt as income is that the release from a debt frees up assets previously offset by the obligation and is an accession to wealth, that is, income. Jelle v. Commissioner, 116 T.C. 63, 67 (2001) (citing United States v. Kirby Lumber Co., 284 U.S. 1, 3 (1931)).

Some "accessions to wealth that would ordinarily constitute income may be excluded by statute or other operation of law." Commissioner v. Dunkin, 500 F.3d 1065, 1069 (9th Cir. 2007), rev'g 124 T.C. 180 (2005). Even so, "given the clear Congressional intent to 'exert . . . the full measure of its taxing power,' * * * exclusions from gross income are construed narrowly in favor of taxation." Id. (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. at 429) (citing Merkel v. Commissioner, 192 F.3d 844, 848 (9th Cir. 1999), aff'g 109 T.C. 463 (1997)).

[*16] Ms. Wienke claimed that her debt with Seterus and Mr. Wienke's debts with Fannie Mae and Freddie Mac were all nonrecourse debts because the lenders did not pursue either of them for the outstanding balances after discharging the debts. Therefore, she argues, these canceled debts should be excluded from her income.

Indebtedness is "generally characterized as 'nonrecourse' if the creditor's remedies are limited to particular collateral for the debt and as 'recourse' if the creditor's remedies extend to all the debtor's assets." Great Plains Gasification Assocs. v. Commissioner, T.C. Memo. 2006-276, 2006 WL 3804622, at *24 (citing Raphan v. United States, 759 F.2d 879, 885 (Fed. Cir. 1985)). A debtor's foreclosure of a property subject to a "nonrecourse liability is treated as a sale or other disposition of the property, and any resulting income constitutes gain on the disposition of property rather than discharge of indebtedness income." See Coburn v. Commissioner, T.C. Memo. 2005-283, 2005 WL 3298877, at *3.

The flaw in Ms. Wienke's argument is that the Forms 1099-C issued for the canceled debts indicated that the borrower was personally liable for repayment. When an information return, such as Form 1099-C, is the basis for the determination of a deficiency, the burden of production may shift to the Commissioner. See sec. 6201(d); Del Monico v. Commissioner, T.C. Memo. 2004-92, 2004 WL 722660, at *2. If a taxpayer in a Court proceeding asserts a

[*17] reasonable dispute with respect to any item of income reported on an information return and has cooperated fully, then the Commissioner must produce reasonable and probative information concerning the deficiency in addition to the information return. Sec. 6201(d).

Even if we assume Ms. Wienke has fully cooperated with respondent, she has not raised a reasonable dispute as to the accuracy of any of the Forms 1099-C. In particular she did not provide any documentation, such as the loan agreements, to support her argument that the debts were nonrecourse. And she even admitted that the lenders could have collected from her and Mr. Wienke. We therefore hold that Ms. Wienke failed to shift the burden to respondent under section 6201(d). See, e.g., Carlson v. Commissioner, T.C. Memo. 2012-76, 2012 WL 947161, at *3, aff'd, 604 F. App'x 628 (9th Cir. 2015). Accordingly, we hold that the debts were all recourse debts and sustain respondent's inclusion of this cancellation of indebtedness as part of Ms. Wienke's gross income for 2012 and 2013. See sec. 61(a)(12); sec. 1.61-12(a), Income Tax Regs.

### 3. Constructive Dividends

When a corporation distributes money or property to a shareholder out of the corporation's earnings and profits, the amount of the distribution constitutes a dividend that must be included in the shareholder's income. Secs. 61(a)(7), 63,

[*18] 301(a), (c), 316.  Characterization of a distribution as a dividend does not depend on a formal dividend declaration; courts have treated as constructive dividends economic benefits conferred by corporations upon shareholders without a corresponding expectation of repayment.  See Boulware v. United States, 552 U.S. 421, 429-430 (2008); Hood v. Commissioner, 115 T.C. 172, 179-180 (2000); Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987); see also Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), aff'g T.C. Memo. 1965-84.  Corporate funds that a controlling shareholder diverts to personal use generally are characterized for tax purposes as constructive dividends.  See Erickson v. Commissioner, 598 F.2d 525, 531 (9th Cir. 1979), aff'g in part, rev'g in part T.C. Memo. 1976-147; see also Meridian Wood Prods. Co. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984) (treating as a constructive dividend a distribution to a controlling shareholder that resulted in an economic benefit to the shareholder and served no legitimate corporate purpose).  A distribution does not escape taxation as a dividend simply because the shareholder did not personally receive the property.  See Sparks Nugget, Inc. v. Commissioner, T.C. Memo. 1970-74, 1970 Tax Ct. Memo LEXIS 279, at *65 (holding that a shareholder diverting corporate funds "to a third party for the benefit of * * * [the] shareholder constitutes a constructive dividend"), aff'd, 458 F.2d 631 (9th Cir. 1972).

[*19] The Wienkes diverted Evergrow's corporate funds in 2012 and 2013 to themselves for personal use and to third parties for their personal benefit. Ms. Wienke argued that these distributions were not taxable dividends but rather returns of loans she made to Evergrow. A bona fide debt "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs.; see also Kean v. Commissioner, 91 T.C. 575, 594 (1988). Whether a corporate payment is for a bona fide debt or equity is a question of fact. See A.R. Lantz Co. v. United States, 424 F.2d 1330 (9th Cir. 1970); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). The key to this determination is the taxpayer's actual intent. Bauer v. Commissioner, 748 F.2d 1365, 1367-1368 (9th Cir. 1984), rev'g T.C. Memo. 1983-120; A.R. Lantz Co., 424 F.2d at 1333-1334.

Ms. Wienke did not provide any credible evidence that she intended to make any loans to Evergrow or that Evergrow took any actions suggesting the existence of a loan (such as paying at regular intervals or deducting interest payments). Her testimony was vague and general and was not supported by any documentation. We therefore hold that Ms. Wienke's actual and constructive receipt of Evergrow's corporate funds were not loan repayments but instead were unreported constructive dividends. Accordingly, we sustain respondent's

[*20] inclusion of $9,707 and $14,593 for 2012 and 2013, respectively, in Ms. Wienke's gross income.

B. Evergrow

Where a taxpayer fails to keep adequate books and records, the Commissioner is authorized to compute the taxpayer's income by any method that clearly, in the Commissioner's opinion, reflects income. Sec. 446(b); see also Choi v. Commissioner, 379 F.3d 638, 639 (9th Cir. 2004), aff'g T.C. Memo. 2002-183; Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989); sec. 1.446-1(b)(1), Income Tax Regs. The Commissioner may use indirect methods to reconstruct income. Holland v. United States, 348 U.S. 121 (1954); Choi v. Commissioner, 379 F.3d at 640. The reconstruction need only be reasonable and based on "some substantive evidence" in the light of all surrounding facts and circumstances. See Hardy v. Commissioner, 181 F.3d at 1004-1005; Petzoldt v. Commissioner, 92 T.C. at 687; Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970).

Evergrow maintained records of the pizza store's gross receipts for every month for the years in issue except for September 2013. The examining agent reconstructed Evergrow's income for that month by using the projection method, which "has received widespread judicial approval." See Jackson v. Commissioner, 73 T.C. 394, 403 (1979). In general the projection method

[*21] extrapolates income for a taxable period from records of income produced by the activity over some shorter or different period. See, e.g., United States v. Janis, 428 U.S. 433, 437 (1976) (upholding projection of 77 days' income on the basis of 5 days' gross proceeds as indicated in wagering records); Nelson v. Commissioner, T.C. Memo. 1987-369.

We conclude that it was reasonable for respondent to extrapolate Evergrow's gross receipts for the year from its receipts before and after September 2013. See Palmer v. United States, 116 F.3d 1309, 1313 (9th Cir. 1997) (holding that it was reasonable to infer the taxpayer had income to support himself for shorter periods where no income was reported); cf. Thrower v. Commissioner, T.C. Memo. 2003-139, 2003 WL 21107675, at *4-*5 (holding that the Commissioner "unreliably derived" a taxpayer's receipts using the projection method with unreliable records of income). Accordingly, we sustain respondent's inclusion of $50,572 in Evergrow's 2013 gross income.[8]

---

[8] At trial Ms. Wienke requested that we abate the statutory interest respondent determined in the notices of deficiency. Our jurisdiction to redetermine a tax deficiency is independent of our jurisdiction to review or abate statutory interest; the latter is not triggered until the taxpayer first exhausts her otherwise available administrative remedies. Sec. 6404(h); Rule 280; Bourekis v. Commissioner, 110 T.C. 20, 26 (1998); Raifman v. Commissioner, T.C. Memo. 2018-101, at *3 n.3; cf. Bennett v. Commissioner, T.C. Memo. 2017-243, at *6-*9. Generally, a taxpayer may seek judicial review only after she files a Form 843,

(continued...)

**[*22]** III.  Deductions

A taxpayer must prove her entitlement to any deductions and credits claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  Taxpayers bear the burden of substantiating their claimed deductions by keeping and producing records sufficient to enable the Commissioner to determine the correct tax liability.  Sec. 6001; INDOPCO, Inc. v. Commissioner, 503 U.S. at 84; sec. 1.6001-1(a), (e), Income Tax Regs.

Section 162 allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  Sec. 162(a); sec. 1.162-1(a), Income Tax Regs.  An expense is "ordinary" if it is "normal, usual, or customary" in the taxpayer's trade or business or it arises from a transaction "of common or frequent occurrence in the type of business involved."

---

[8](...continued)
Claim for Refund and Request for Abatement, in response to a notice of assessment of interest and either the Commissioner issues a final determination not to abate interest or the claim has been pending 180 days.  Sec. 6404(h); see Bourekis v. Commissioner, 110 T.C. at 26; Bennett v. Commissioner, at *7; sec. 301.6404-1(c), Proced. & Admin. Regs.  Ms. Wienke however has not alleged receipt of, nor entered into evidence, a final determination that shows respondent rejected her interest abatement request or even a notice of assessment of interest that would cause her to file a Form 843.  Her request therefore is premature.  See Rogers v. Commissioner, T.C. Memo. 2009-111, 2009 WL 1406024, at *5.

**[*23]** <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940). An expense is "necessary" if it is "appropriate and helpful" to the taxpayer's business, but it need not be absolutely essential. <u>Commissioner v. Tellier</u>, 383 U.S. 687, 689 (1966) (quoting <u>Welch v. Helvering</u>, 290 U.S. at 113). In contrast, a taxpayer may not deduct personal, living, or family expenses unless the law expressly provides otherwise. Sec. 262(a). The determination of whether an expense satisfies the requirements of section 162 is a question of fact. <u>Cloud v. Commissioner</u>, 97 T.C. 613, 618 (1991) (citing <u>Commissioner v. Heininger</u>, 320 U.S. 467, 473-475 (1943)).

Federal income tax law distinguishes between a payment that a taxpayer can deduct currently as an expense and a payment that she must treat as a capital expenditure. <u>See</u> <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. at 83-84. The distinction between a current expense and a capital expenditure is important in that "business expenses are currently deductible, * * * [while] a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise." <u>Id.</u>; <u>see also</u> <u>Smith v. Commissioner</u>, 300 F.3d 1023, 1028-1029 (9th Cir. 2002), <u>aff'g</u> <u>Vanalco, Inc. v. Commissioner</u>, T.C. Memo. 1999-265; <u>Lychuk v. Commissioner</u>, 116 T.C. 374, 410 (2001).

**[\*24]** A.  Ms. Wienke

Section 167 generally allows a deduction for the exhaustion and wear and tear of property used in a trade or business or for the production of income.  To determine the annual depreciation deduction for the property, taxpayers are required to use the modified accelerated cost recovery system (MACRS) outlined in section 168.  See Tax Reform Act of 1986, Pub. L. No. 99-514, secs. 201, 203, 100 Stat. at 2121, 2143.  MACRS dictates the applicable depreciation method, recovery period, and convention to use in calculating a depreciation deduction.  Sec. 168(a).

For residential rental property MACRS specifically dictates that taxpayers use the straight-line method and a recovery period of 27.5 years.[9]  See sec. 168(b)(3)(B), (c).  Land generally is not depreciable, but improvements or physical developments added to land may be depreciable.  Sec. 1.167(a)-2, Income Tax Regs.  If a taxpayer pays a lump sum for property comprising both depreciable improvements and nondepreciable land, she must apportion the cost between the land and the improvements for purposes of calculating depreciation deductions.  Sec. 1.167(a)-5, Income Tax Regs.; see also Broz v. Commissioner, 137 T.C. 46, 58 (2011) (finding that the lump sum paid for a combination of depreciable and

---

[9] The applicable convention is not in issue in these cases.

[*25] nondepreciable property "must be apportioned between the two types of property to determine their respective costs").  Taxpayers also may depreciate the costs of capital improvements they make to residential rental property after purchasing the property, but they bear the burden of establishing and substantiating these costs.  See secs. 167, 263; Chico v. Commissioner, T.C. Memo. 2019-123, at *37-*38.

Ms. Wienke admitted that she calculated depreciation deductions for each rental property using the entire purchase price for the property as the depreciable cost rather than apportioning the purchase price between the land and the preexisting improvements.  To that amount she also added the costs of capital improvements that she and Mr. Wienke made to each property after purchasing it.  She claimed that some of the rental properties needed extensive renovations that required the Wienkes to make repairs or build improvements before they could place the properties into service.  But she could not substantiate the costs for the Wienkes' postpurchase capital improvements or show whether she previously deducted some of the costs as repairs.  The invoices she did produce she could not tie to a particular property or renovation.  And she was unable to produce any schedules showing her calculation of her depreciation deductions.  She first testified that she did not include "capital improvements" in her depreciation

[*26] calculations, but then testified that she did for the tax returns. Other than this confusing testimony, she did not challenge respondent's use of county property tax records to determine each property's cost basis and allocate the basis between the land and the improvements.

We hold that Ms. Wienke used an impermissible method to calculate the depreciation deductions for the rental properties. Accordingly, we sustain respondent's change of method for computing the rental properties' depreciation deductions and his adjustments to Ms. Wienke's Schedule E depreciation deductions for 2012 and 2013.[10]

Respondent's change to Ms. Wienke's method of computing depreciation deductions is a change in her method of accounting. See Pinkston v. Commissioner, T.C. Memo. 2020-44, at *22; sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. Section 481(a) authorizes the Commissioner to adjust a taxpayer's income for the year the taxpayer changes her method of accounting, whether initiated by the taxpayer or the Commissioner. See Suzy's Zoo v. Commissioner, 273 F.3d 875, 883 (9th Cir. 2001), aff'g 114 T.C. 1 (2000); see also sec.

_____

[10] Without these deductions Ms. Wienke's passive losses are less than her passive gains in 2012 and 2013. We therefore need not consider respondent's second challenge to Ms. Wienke's deductions, namely, whether she was permitted to claim nonpassive rental activity losses as a real estate professional. See sec. 469(c)(7).

**[\*27]** 1.446-1(e)(2)(ii)(d)(5)(iii), Income Tax Regs. (providing that a "change from an impermissible method of computing depreciation" to a permissible method "results in a section 481 adjustment.").[11] When the change in method of accounting is involuntary (i.e., not initiated by the taxpayer), the entire amount of the adjustment is included in the taxpayer's income in the first taxable year in which taxable income is computed under a method of accounting that is different from the method that was used in the prior year. Sec. 1.481-1(c)(3), Income Tax Regs.

---

[11] In general, the provisions in sec. 1.446-1(e)(2), Income Tax Regs., apply "on or after December 30, 2003." Sec. 1.446-1(e)(4)(i), Income Tax Regs. The provisions in sec. 1.446-1(e)(2)(ii)(d), Income Tax Regs., apply with respect to "depreciable or amortizable asset[s] placed in service by the taxpayer in a taxable year ending on or after December 30, 2003." See id. subpara. (4)(ii). The Wienkes placed some of the rental properties in service before 2003, so the provisions in sec. 1.446-1(e)(2)(ii)(d), Income Tax Regs., would not apply to those properties. However, sec. 168 "determines the depreciation allowance for tangible property that is of a character subject to the allowance for depreciation provided in section 167(a) and that is placed in service after December 31, 1986". Sec. 1.168(a)-1(a), Income Tax Regs. The Wienkes placed all of the rental properties in service after December 31, 1986, as part of their trade or business. Therefore, all of the properties should have been depreciated using the MACRS system established by sec. 168 and any adjustments to the depreciable bases and MACRS recovery periods for these assets constitute changes in the Wienkes' method of accounting that require a sec. 481 adjustment to prevent duplication of deductions or omission of income. See Pinkston v. Commissioner, T.C. Memo. 2020-44, at \*10, \*19.

[*28] A taxpayer's taxable income for the year of a change in method of accounting is computed by taking "into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted". Sec. 481(a)(2); see sec. 1.481-1(a)(1), Income Tax Regs.; see also Mingo v. Commissioner, 773 F.3d 629, 635 (5th Cir. 2014) ("Following a change of accounting method, the Commissioner may make any necessary adjustments to prevent taxable income from being duplicated or omitted as a result of the change under I.R.C. § 481(a)(2)."), aff'g T.C. Memo. 2013-149. The adjustment for the year of the change may reflect tax liabilities for years "when the statute of limitations would otherwise bar reopening the taxpayer's prior returns." Suzy's Zoo v. Commissioner, 273 F.3d at 884 (citing Rankin v. Commissioner, 138 F.3d 1286, 1288 (9th Cir. 1998), aff'g T.C. Memo. 1996-350); see also Mingo v. Commissioner, 773 F.3d at 636 ("Once there has been a change in the method of accounting, no statute of limitations applies to the Commissioner's ability to correct errors on old tax returns."). Congress has "mandated through its enactment of section 481 that an adjustment under section 481 generally must be made to remove the threat of a double benefit or omission whenever there is a change in a method of accounting." Wasco Real Props. I, LLC v. Commissioner, T.C. Memo. 2016-224, at *50, aff'd, 744 F. App'x 534 (9th Cir.

[*29] 2018); see also Suzy's Zoo v. Commissioner, 273 F.3d at 883 ("The purpose of § 481 is to prevent either a distortion of taxable income or a windfall to the taxpayer arising from a change in accounting method[.]").

A change in method of accounting includes not only a change in the taxpayer's overall plan of accounting but also "a change in the treatment of any material item used in such overall plan." Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. An item is "material" when it affects the timing of reporting income or deductions, as opposed to "how much income is reported, or whether a deduction would ever have been appropriate." Rankin v Commissioner, 138 F.3d at 1288; see sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. (defining a material item as "any item that involves the proper time for the inclusion of the item in income or the taking of a deduction"); see also Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 510 (1989) (holding that when an accounting practice "postpones the reporting of income, rather than permanently avoiding the reporting of income over the taxpayer's lifetime, it involves the proper time for reporting income"); Primo Pants Co. v. Commissioner, 78 T.C. 705, 722 (1992) (noting that materiality "turns on whether the items affect timing").

Respondent changed Ms. Wienke's method of accounting for her depreciation deductions starting in 2012. See sec. 1.446-1(e)(2)(ii)(a), Income

**[*30]** Tax Regs. Respondent then made a section 481(a) adjustment to include in Ms. Wienke's income one-half of the disallowed depreciation deductions from her earlier tax years for each property. For all but three properties, the disallowed depreciation deductions for each property are less than the remaining lifetime allowable depreciation amounts the Wienkes are permitted to deduct after 2011 for each property. For three properties, all on Foothill Boulevard (Foothill properties), the disallowed depreciation deductions ($19,657, $127,090, and $49,278, respectively) exceed the remaining lifetime allowable depreciable amounts after 2011 ($15,674, $5,022, and $28,061, respectively). But, as we explained above, Ms. Wienke offered no evidence regarding the cost bases that she used to calculate the depreciation deductions and did not challenge respondent's computation of her cost bases. The record does not show that the disallowed amounts exceed the cost basis that the Wienkes would be able to offset against gross proceeds when they sell the Foothill properties. Therefore, respondent has only "changed the timing of when (and how) that cost recovery will occur" for the Foothill properties.[12] See Pinkston v. Commissioner, at *15.

---

[12] "In determining whether an item postpones or accelerates the reporting of income, courts have generally assumed that relevant future events (such as sale of the property) will ultimately occur." Pinkston v. Commissioner, at *15 n.5.

**[\*31]** Because the Wienkes will be allowed to recover the disallowed depreciation deductions in later years, we conclude that respondent's section 481 adjustments affect when that cost recovery is appropriate, not whether it was ever appropriate. See Rankin v. Commissioner, 138 F.3d at 1288. Accordingly, we sustain respondent's entire section 481 adjustment.

B. Evergrow

A corporation also bears the burden of proving its entitlement to any deductions. See Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974); New Colonial Ice Co. v. Helvering, 292 U.S. at 440. Like any other taxpayer, a corporation is required to maintain sufficient records to establish the amount of a deduction to enable the Commissioner to determine the correct tax liability. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.; see also Higbee v. Commissioner, 116 T.C. at 440.

Under the Cohan rule, the Court may estimate the amount of an expense if the corporate taxpayer is able to demonstrate that it has paid or incurred a deductible expense but cannot substantiate the precise amount, as long as it produces credible evidence that provides a basis for the Court to do so. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); see also Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Allowing a deduction without

[*32] evidence that would enable us to make these determinations would amount to "unguided largesse". Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957).

### 1. 2012 Business Expense Deductions

Evergrow failed to produce any evidence to show that it actually paid taxes, license expenses, or interest in 2012. Accordingly, we sustain respondent's adjustments to Evergrow's business expense deductions for 2012.

### 2. 2013 and 2014 Officers' Compensation Deductions

In computing its corporate income tax, a corporation may deduct from its income "a reasonable allowance for salaries or other compensation for personal services actually rendered". Sec. 162(a)(1). Payments to corporate shareholders in the form of salaries or other compensation "warrant close scrutiny to ensure that a portion of the purported compensation payments is not a disguised dividend." Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), rev'g and remanding T.C. Memo. 1980-282. Payments primarily for the benefit of a shareholder rather than for personal services provided by the shareholder are not compensation but rather are nondeductible constructive dividends. Hood v. Commissioner, 115 T.C. at 176 n.5; Magnon v. Commissioner, 73 T.C. 980, 994-997 (1980); see also Benson v. Commissioner, 560 F.3d 1133, 1134 (9th Cir.

**[*33]** 2009) (finding that an economic benefit is a constructive dividend when the corporation provides it to a shareholder "with no expectation of reimbursement"), aff'g T.C. Memo. 2006-55.

Evergrow made irregular payments to the Wienkes in the form of draws and payments of their personal expenses that together totaled $25,346 and $26,638 in 2013 and 2014, respectively. Evergrow did not withhold employment tax or issue Forms W-2 related to any of these payments, nor did it present any credible evidence that it made these payments for personal services the Wienkes rendered or with any expectation that the Wienkes would reimburse it. We therefore hold that these payments were nondeductible constructive dividends. And Evergrow did not provide any substantiation for the remaining $216,000 it claimed as officers' compensation for 2014; indeed Ms. Wienke in effect admitted that she added this deduction because it was "something in * * * [her] mind", and the revenue agent testified that she told him that she created the deduction so that Evergrow's net income would more closely reflect what it earned for the year. Therefore, we will sustain respondent's disallowance of Evergrow's officers' compensation deductions for 2013 and 2014.

**[\*34]** IV. <u>Cost of Goods Sold</u>

A business is allowed to offset its gross receipts with COGS to compute gross income. <u>See</u> <u>Metra Chem. Corp. v. Commissioner</u>, 88 T.C. 654, 661 (1987); secs. 1.61-3(a), 1.162-1(a), Income Tax Regs. COGS is not a deduction and is not subject to the limits on deductions in section 162, <u>Metra Chem. Corp. v. Commissioner</u>, 88 T.C. at 661, but any amount reported as COGS still must be substantiated, <u>King v. Commissioner</u>, T.C. Memo. 1994-318, 1994 WL 330613, at \*2, <u>aff'd without published opinion</u>, 69 F.3d 544 (9th Cir. 1995).

Evergrow submitted no evidence to substantiate that it had COGS in excess of any amounts respondent already allowed for the years in issue. Accordingly, Evergrow has not proved it is entitled to any additional COGS. We therefore will sustain respondent's adjustments to its COGS for the years in issue.

V. <u>Additions to Tax</u>

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to file a return timely unless a taxpayer shows that such failure was due to reasonable cause and not willful neglect. <u>See</u> <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985). The Commissioner bears the burden of production for this addition to tax for individuals. <u>See</u> sec. 7491(c); <u>Higbee v. Commissioner</u>, 116

[*35] T.C. at 446-447.[13] We have held that, as part of that burden, the Commissioner must introduce evidence showing that the taxpayer did not file his return (or a request for extension of time) by the original due date of the return. Wheeler v. Commissioner, 127 T.C. 200, 207-208 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008). Respondent satisfied his burden when he produced the tax returns for Ms. Wienke for both years in issue showing the returns were not filed by their due dates. The record also shows that Evergrow's tax returns were not timely filed.

Ms. Wienke argued that the reasonable cause exception should apply because both her returns and Evergrow's returns were filed late because of personal issues with her husband. Whether a taxpayer has "reasonable cause" within the meaning of section 6651(a)(1) depends on whether the taxpayer "exercised 'ordinary business care and prudence' but nevertheless was 'unable to file the return within the prescribed time.'" United States v. Boyle, 469 U.S. at 246 (quoting section 301.6651-1(c)(1), Proced. & Admin. Regs.). While we are sympathetic to the challenges Ms. Wienke faced over this period, nothing in the

---

[13] The burden of production as to Evergrow's additions to tax remains with Evergrow because sec. 7491(c) does not apply to corporations. See Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. 224, 231-232 (2018); NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006).

**[*36]** record shows that she applied for any extensions of time to file the tax returns or could not have prepared timely returns with a reasonable degree of accuracy on the basis of the information available to her.  We therefore hold that petitioners are liable for the section 6651(a)(1) additions to tax in issue as determined by respondent.

Any contentions we have not addressed we deem irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Appropriate decisions will be entered</u>.